UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-18-09

------------------------------------X

STEVEN MICHAEL HARRIS,

                        Plaintiff,          08 Civ. 3477

         -against-                          OPINION

SIMON & SCHUSTER, INC., and THE
MCGRAW-HILL COMPANIES, INC.,

                   Defendants.

------------------------------------X

A P P E A R A N C E S:


          Attorneys for Plaintiff

          CAESAR, RIVISE, BERNSTEIN, COHEN &
             POKOTILOW, LTD.
          1635 Market Street, 11th Floor
          Philadelphia, PA  19103
          By:  William J. Castillo, Esq.
               Manny Pokotilow, Esq.
               Salvatore Guerriero, Esq.


          Attorneys for Defendants

          DAVIS WRIGHT TREMAINE LLP
          1633 Broadway
          New York, NY  10019
          By:  Marcia B. Paul, Esq.
               Bryan M. Tallevi, Esq.

**Sweet, D.J.**

Defendants Simon & Schuster, Inc. ("S&S") and The
McGraw-Hill Companies, Inc. ("MGH") (collectively, the
"Defendants") have moved pursuant to Rule 56, Fed. R. Civ.
P., for summary judgment dismissing the complaint of
plaintiff Steven Michael Harris ("Harris" or the
"Plaintiff") alleging copyright violation by Defendants of
the book This is My Trunk (the "Work") authored by Harris,
as well as prevailing party attorneys' fees. Upon the
facts and conclusions set forth below, the motion is
denied.

## I. PRIOR PROCEEDINGS

The complaint alleging direct and contributory
copyright violations by Defendants was filed on April 10,
2008.

After reference to the Honorable Henry B.
Pittman, Magistrate Judge, for settlement, the instant
motion was made, heard and marked fully submitted on
October 30, 2008.

**II.  FACTS**

The parties have set forth the facts in the
Defendants' Rule 56.1 Statement, the Plaintiff's Rule 56.1
Counterstatement and supporting and reply affidavits.  The
facts are not in dispute except as noted below.

**A. The Publishing Agreements**

Harris was a clown with Ringling Brothers and
Barnum and Bailey Circus and wrote the Work, a book for
children, in 1983 about that experience.

The Work was illustrated by Norma Welliver
("Welliver") and published by Atheneum Publishers, Inc.
("Atheneum") in 1985 pursuant to two agreements.  The
first, dated August 22, 1984, was executed on or about
August 29, 1984, between Harris and Atheneum (the "Harris
Agreement").  The second agreement was dated August 22,
1984, and executed on or about September 4, 1984, between
Welliver and Atheneum (the "Welliver Agreement")
(collectively, the "Publishing Agreements").  On March 17,
2008, Welliver assigned her full right, title and interest
under the Welliver Agreement to Harris.  As successor-in-

2

interest to Atheneum, S&S acquired Atheneum's rights and
obligations under the Publishing Agreements.

The Publishing Agreements are substantially
identical. Paragraph 10 grants S&S the "exclusive right .
. . to license, sell or otherwise dispose of the following
rights" in the Work:

> publication or sale of your work by book clubs;
> publication of a reprint edition of your work by
> another publisher; condensations; serializations
> in magazines or newspapers (whether in one or
> more installments . . . after book publication);
> . . . publication of your work and selections
> therefrom in anthologies, compilations and
> digests; picturized book versions, microprint and
> microfilm versions.

Weidman Aff., Exh. B at ¶ 10, Exh. C at ¶ 10.[1]  Paragraph 19
provides that "[a]ny rights in your work not specifically
granted to us hereunder are reserved to you." Id., Exh. B
at ¶ 19, Exh. C at ¶ 19.

Both Publishing Agreements are standardized,
"form" contracts of Atheneum. Without an agent or an
attorney, Plaintiff negotiated and executed the Harris

---

[1] Paragraph 10 of the Harris Agreement differs from the same paragraph
of the Welliver Agreement in that the following derivative rights have
been struck from that provision of the Harris Agreement only:
"dramatic, motion picture (including but not by way of limitation, film
strips based on the story and film strips or motion picture
photographed directly from the book), phonograph, and broadcasting
rights, and electronic, mechanical or visual reproduction rights;
publication of your work in the British Commonwealth, publication of
your work in foreign languages." Weidman Aff., Exh. B at ¶ 10.

3

Agreement and other than his signature, the date of his
signature, his Social Security Number, and the handwritten
Salisbury, Vermont address, none of the language,
interlineations or markings shown on the copy of the Harris
Agreement were made by Harris.

When the Work was first published, Harris
developed a presentation on the topic of writing for
students, in which Harris used the clown props described in
the Work to discuss writing and language arts. Harris used
the Work, samples from its original manuscript, the galley
proofs for the Work and rejection letters from publishers
to explain the difficult process by which a writer's book
gets published.

After its publication, the Work was nominated for
several awards. In early 1987, Marcia Marshall
("Marshall"), an editor at Atheneum, telephoned Harris
about its nomination for the Texas Bluebonnet Award, an
award sponsored by the Texas Library Association, and told
Harris that Atheneum was running low on its stock of the
Work. Harris asked Marshall to have Atheneum publish more
copies of the Work. Marshall advised Harris that Atheneum
would not do a second printing unless both Harris and

4

Welliver reduced their royalties on all copies sold for the
second printing. Harris agreed to a lower royalty in
consideration of a second printing by Atheneum.

On or around July 27, 1987, Marshall mailed
Harris a rider to the Harris Agreement reflecting this
change in royalties and requesting Harris sign and return
the rider to Atheneum along with the initial Harris
Agreement. Plaintiff signed this rider and sent it, along
with the original Harris Agreement, to Atheneum.

After Spring 1989, Harris does not recall having
received any further communications from Atheneum or any
further royalty payments until immediately prior to the
filing of the instant suit.

In 1995, Harris became interested in pursuing new
publishing opportunities with regard to the Work. When he
sought to contact Atheneum, he discovered that the
publishing rights now belonged to S&S. At that time, he
inquired about getting the rights back and requested a copy
of the Publishing Agreement. Harris did not receive any
communications or a copy of the Agreement from S&S in
response.

**B. The Standardized Tests**

CTB/McGraw-Hill LLC ("CTB"), sued here as MGH,
develops, publishes and licenses standardized tests for
middle school students and other learners, which are then
purchased and administered by testing authorities such as
school boards and other governmental entities. The tests
developed and published by CTB vary in length, number of
questions, and subject matter, and contain a variety of
different sections, including reading, language arts,
mathematics, social studies, and science. The reading and
language arts sections of these tests contain excerpts from
various literary works licensed to CTB from publishing
companies and authors. A series of related questions
designed by CTB to evaluate the test-taker's reading
comprehension follows each excerpt.

On three separate occasions on June 15, 1998 (the
"1998 License"), August 17, 2003 (the "2003 License"), and
August 1, 2006 (the "2006 License") (collectively, the
"Licenses"), S&S granted CTB licenses to use an excerpt
from the Work in certain CTB tests.

6

The 1998 License granted CTB the right to use "5 text pages and 2 illustrations" from the Work in the "California Achievement Test, 6th Edition Tryout test and repeat use in other CTB tests for a period of five years." Id., Exh. F. The 1998 License applied "only to the edition of the work specified in this agreement, limited to a print run of 3,300 copies" and "solely to publication of the above-cited work in the English language in the State of California." Id. In addition, it provided that the "permission granted herein is non-exclusive and not transferable." Id.

The 2003 License granted CTB permission to use "4 text pages and illustration" from the Work in "soft cover test booklets for the TCAP/O 2004 Operational test and repeat use for a five year period in other CTB tests" and limited the print run to 90,000 copies. Id. The 2003 License similarly limited its scope "to publication of the above-cited work in the English language in the State of Tennessee," and again provided that the "permission granted herein is non-exclusive and not transferable." Id.

Finally, the 2006 License granted CTB a limited license for a one-time use of "4 text pages and 2

7

illustrations" from the Work in "softcover test booklets
for the Hawaii 2006 Operational Test for use during
September 2006" and applied "solely to publication of the
above-cited work in the English language in the State of
Hawaii." Id. The 2006 License also provided that the
"permission granted herein is non-exclusive and not
transferable." Id. No custom test was ultimately
developed, and therefore CTB never reproduced the Work
pursuant to the 2006 License.

According to Harris, CTB also "sublicensed" the
Work to a third party, American Institutes for Research
("AIR"), a developer of educational testing programs.
Harris alleges that CTB allowed AIR to use the Work in
connection with its development of the Hawaii Operational
Test that was administered in Spring of 2007, 2008 and
2009.

The relevant excerpt of the Work used by CTB in
the tests consisted of a verbatim reproduction of a portion
of the text from pages 7-11 of the Work and two
illustrations taken from the same pages (the "Passage").
The Passage differed from the Work in that the font was
changed, three illustrations were taken out and the

8

remaining illustrations rearranged. CTB also added
original questions, which were related to and dependent
upon the text of the Work, to the end of the Passage.
According to CTB, in each of the seventeen standardized
tests from 1998 through the present in which the Work was
excerpted, the identical Passage was used and Harris and
Welliver were credited as the author and illustrator,
respectively. CTB reproduced the Passage alongside
excerpts from between four and twelve other literary works,
questions relating to the excerpts, and other original
program design material.

On April 26, 2007, about a week after Harris had
conducted one of the educational presentations described
above, he discovered that the Work was being used in
connection with a standardized achievement test entitled
TerraNova, The Second Edition, CAT Survey, Form C
("TerraNova Test"). After learning of this use of the
Work, Harris spoke with Christopher Fuller ("Fuller"), an
S&S employee, and expressed his concern.

Approximately six months later, on November 14,
2007, Harris wrote the legal department of S&S stating that
the use of the Work in the TerraNova Test was made without

9

his prior knowledge and was unauthorized. Jennifer Weidman
("Weidman"), Vice President and Senior Counsel of S&S,
responded to Harris's letter and stated that the reason why
Harris never received any royalty statements from the use
of the Work in CTB's standardized achievement tests was due
to the fact that Harris had changed his address without
notifying S&S and advised Harris that the last address S&S
had for him was "121 Main South Main, Middlebury, VT
05753."

After Harris presented his objections to Weidman,
S&S sent him two checks for the royalties that were
allegedly due under the Harris Agreement. By letter dated
March 13, 2008, Harris returned that royalty payment to
S&S. Upon learning that Welliver had assigned her rights
to Harris, S&S sent another payment of $15,148.82 to Harris
for the total amount allegedly owed him under the
Publishing Agreements, which Harris again refused. The
instant action ensued.

**III. THE SUMMARY JUDGMENT STANDARD**

Summary judgment is granted only if there is no
genuine issue of material fact and the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004). The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

For the purposes of summary judgment, "[a] fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law' . . . [and an] issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson, 477 U.S. at 248). The moving party has the initial burden of showing that there are no material facts in dispute, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for

11

trial," Fed. R. Civ. P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

In determining whether a genuine issue of material fact does exist, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quotation and citation omitted).

**IV. DISCUSSION**

Defendants argue that summary judgment is appropriate here because, in licensing the Work to CTB for use in the tests, both S&S and CTB acted within the scope of their rights as set forth in the Publishing Agreements and the Licenses. While the Court agrees with Defendants

12

that the Publishing Agreements authorized S&S to license
the Work for use in standardized tests of the type
published by CTB, whether CTB acted within the scope of its
Licenses cannot be determined on these facts and therefore
summary judgment must be denied.

## A. The Tests Constitute Compilations

The Publishing Agreements provide S&S with the
exclusive right to "license, sell or otherwise dispose" of
certain enumerated rights in the Work, including, inter
alia, publication of the Work and selections therefrom "in
anthologies, compilations and digests." Weidman Aff., Exh.
B at ¶ 10; Exh. C at ¶ 10. It is Defendants' position that
because the tests constitute "compilations," S&S's
licensing of the Work to CTB was authorized and not a
copyright violation.

The Copyright Act defines a "compilation" as "a
work formed by the collection and assembling of preexisting
materials or of data that are selected, coordinated, or
arranged in such a way that the resulting work as a whole
constitutes an original work of authorship." 17 U.S.C. §
101; see 1 Melville B. Nimmer & David Nimmer, Nimmer on

13

Copyright § 3.02 ("[A] 'compilation' results from a process
of selecting, bringing together, organizing, and arranging
previously existing material of all kinds . . . ."
(internal citation omitted)). The definition of
compilation includes "collective works," which are
independently defined as works "in which a number of
contributions, constituting separate and independent works
in themselves, are assembled into a collective whole." 17
U.S.C. § 101. Collective works are a species of
compilations, resulting from the selection and arrangement
of brief portions of independent, copyrightable works into
a single work. See Roy Export Co. Establishment of Vaduz,
Liechtenstein v. Columbia Broad. Sys., 672 F.2d 1095, 1098,
n.5 (2d Cir. 1982) (describing subject work as "more
precisely a collective work," rather than a compilation,
"since its components, excerpts from copyrighted films, are
independent works in themselves" (internal quotations
omitted)).

According to Defendants, standardized tests are
prototypical examples of compilations. Each test combines
licensed excerpts from literary works with original
materials, including questions, for the purpose of creating
original and effective testing devices, resulting in new

14

works of authorship. Indeed, other courts have held that this type of test "easily meets" the definition of a compilation and merits copyright protection. See Educ. Testing Serv. v. Simon, 95 F. Supp. 2d 1081, 1088-89 (C.D. Cal. 1999).

Harris vigorously disputes the characterization of the tests as "compilations," since the tests do more than merely combine the Work with other works. Rather, Harris argues, because the tests also "recast" the Work by excising certain text and illustrations and rearranging them as part of a new work, they constitute "derivative works," which fall outside the scope of rights conferred to S&S pursuant to the Publishing Agreements. A "derivative work" is defined by the Copyright Act as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. The difference between a compilation on the one hand and a derivative work on the other has been described thusly: "[W]hile a compilation consists merely of the selection and arrangement of pre-existing material without any internal

15

changes in such material, a derivative work involves
recasting or transformation, i.e., changes in the pre-
existing material, whether or not it is juxtaposed in an
arrangement with other pre-existing materials." 1 Nimmer §
3.02.

Although Plaintiff makes much of the fact that
the Copyright Act includes two different definitions for
"derivative works" and "compilations," the definition of a
derivative work is broad, see 1 Nimmer § 3.01 ("In a broad
sense, almost all works are derivative works in that in
some degree they are derived from pre-existing works."),
and Harris points to no provision of the Copyright Act that
indicates that, in certain circumstances, a compilation
cannot also be a derivative work. Indeed, "[a] collective
work more nearly resembles a derivative work than it does
other forms of compilation. . . . The fact that the
originality called for in a collective work consists of the
collection and assembling of pre-existing works, while
derivative work originality lies in the manner in which a
pre-existing work is transformed, would not appear to
justify a difference in substantive treatment, and hence,
not require a terminological distinction." Id. § 3.02.

16

In emphasizing the distinction between a derivative work and a compilation, Harris cites Jarvis v. K-2 Inc., 486 F.3d 526 (9th Cir. 2007). In Jarvis, the defendant combined a series of photographs taken by plaintiff into a collage after his license to use the images had expired. In its use of the photos, the new collages "shrank, expanded, distorted, overlaid and otherwise edited the original images, while also combining them with photos taken by other photographers, additional graphics, the K2 logo and marketing slogans." Id. at 531 (citation omitted). On those facts, the court held that the resulting collage constituted a derivative work, rather than a collective work, for the limited purpose of determining whether the § 17 U.S.C. 201(c) privilege applied. Id. at 532.

The distinction made in Jarvis is an example of one of a limited number of cases where such categorization matters. See 1 Nimmer § 3.08. The distinction between a collective work and a derivative work is of even less import here where the Publishing Agreements permit use of the Work in compilations, as well as periodicals, digests, and condensations. All three of these latter types of work fit squarely within the statutory definition of a

17

derivative work, indicating that derivative works are not categorically excluded from the Publishing Agreements as Harris contends. The standardized tests, which excerpt, arrange, and recast preexisting works in ways similar to the types of derivative works listed above, constitute collective works and are therefore permitted under the Publishing Agreements.

Harris also argues that the Publishing Agreements only grant S&S the right to license the Work for use in books. In support of his argument, Harris points to the provision of the Publishing Agreements that reserves all rights not granted to S&S in the author. Such a provision however, does not clarify the scope of the agreement itself. See Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481, 488 (2d Cir. 1998) ("The reservation clause stands for no more than the truism that [plaintiff] retained whatever he had not granted. It contributes nothing to the definition of the boundaries of the license."). More significantly, the Publishing Agreements do not, by their own terms, limit S&S's right to license use of the Work to books. Paragraph 10 explicitly grants the right to publish the Work in periodicals, newspapers and magazines. While Harris places significance

on the deletion from the Harris Agreement of motion

picture, dramatic, phonographic and broadcast rights, this

alteration does not affect an unambiguous reading of the

Harris Agreement which does grant S&S the right to license

the Work for use in compilations. See Reinhardt v. Wal-

Mart Stores, Inc., 547 F. Supp. 2d 346, 352 (S.D.N.Y. 2008)

("If the contract language is unambiguous and conveys a

definite meaning, its interpretation is a question of law

for the court.").

Based on the foregoing, the tests constitute

compilations and S&S was within its rights under the

Publishing Agreements in licensing the Work to CTB.

## B. The Licenses Are Ambiguous as to Whether Use of the Work in the Tests Was Within the Scope of the Licenses

In opposition to Defendants' motion, Harris

argues that even if it was within S&S's rights to license

the Work to CTB for use in the Tests, CTB exceeded the

scope of the Licenses. Harris specifically claims that CTB

exceeded the scope of the Licenses by publishing the Work

in locales not explicitly covered by the Licenses. CTB

reproduced the Passage in seventeen different standardized

19

tests from 1998 through 2008. According to Harris, twelve
of the tests were published and administered in places
other than those specified in the Licenses. Because the
Licenses do not unambiguously authorize CTB's use of the
Work in tests outside the specified locales, Defendants'
motion must be denied.

As an initial matter, the statute of limitations
in copyright actions is three years. 17 U.S.C. § 507(b).
Although the Copyright Act is silent as to when the claim
accrues and the Court of Appeals has not yet addressed the
issue, the majority of courts in this Circuit have most
recently concluded that a copyright claim accrues at the
time of infringement, rather than at the time of discovery.
See Auscape Int'l v. Nat'l Geographic Soc., 409 F. Supp. 2d
235, 247 (S.D.N.Y. 2004) (analyzing case law, text and
legislative history of Copyright Act in concluding that
"copyright infringement accrues on the date of the
infringement"); Broadvision Inc. v. Gen. Elec. Co., No. 08
Civ. 1478 (WHP), 2009 WL 1392059, at *6 (S.D.N.Y. May 5,
2009) (listing cases). Accordingly, to the extent Harris
argues that CTB exceeded the scope of the Licenses with
respect to tests published prior to April 2005, those
claims are time-barred and cannot be maintained.

A valid license, either exclusive or non-
exclusive, "immunizes the licensee from a charge of
copyright infringement, provided that the licensee uses the
copyright as agreed with the licensor." Davis v. Blige,
505 F.3d 90, 100 (2d Cir. 2007). "[D]etermining whether a
defendant's activities fall within the scope of an existing
license essentially involves a question of contract
interpretation." Reinhardt, 547 F. Supp. 2d at 352. "If
the contract language is unambiguous and conveys a definite
meaning, its interpretation is a question of law for the
court." Id. Where, however, "the language used is
susceptible to differing interpretations, each of which may
be said to be as reasonable as another, then the
interpretation of the contract becomes a question of fact
for the jury and extrinsic evidence of the parties' intent
properly is admissible." Bourne v. Walt Disney Co., 68
F.3d 621, 629 (2d Cir. 1995) (internal quotations and
citation omitted). Where the issue is the scope of the
license, "'the copyright owner bears the burden of proving
that the defendant's copying was unauthorized.'" Tasini v.
New York Times Co., 206 F.3d 161, 171 (quoting Bourne, 68
F.3d at 631).

With respect to uses of the Work by CTB in tests
published after April 2005, Defendants contend that
permission to reprint the Passage in different territories
was based on the 2003 License which expressly provided for
"repeat use" in other CTB tests for a period of five years.[2]
For each test in which the Passage appeared, S&S authorized
and received payment for the repeat use of the Work
pursuant to the terms of the 2003 License and documented
the use by correspondence referencing the applicable
underlying license and evidence of payment for the repeat
uses. Although all three Licenses included geographical
restrictions for the initial use of the Work, Defendants
argue that no such limitation applied in connection with
its repeat use.

Defendants' interpretation granting CTB the right
to re-publish an excerpt of the Work outside the limited
geographical area identified in the 2003 License is far
from apparent from text of the Licenses. The 2003 License

---

[2] Since any use of the Work pursuant to the 1998 License and the five
year period in which reprints were authorized would have been made
prior to 2005, Harris's claims with respect to any use pursuant to the
1998 License would be barred by the statute of limitations, discussed
supra. In addition, while a separate license was obtained for the
Hawaii 2006 Operational Test, a custom test was never developed and CTB
administered its Terra Nova Form C test relying on the 2003 License, so
no infringement under the 2006 License ever occurred. This Court's
analysis will, therefore, focus on the 2003 License.

22

explicitly limits permission "solely to publication of the
above-cited work in the English language in the State of
Tennessee." Defendants ask the Court to assume that this
limitation does not apply to the "repeat use for a five
year period in other CTB tests," but point only to the fact
that CTB routinely paid for, and S&S consented to, repeat
uses of the Work in other states pursuant in support of
their interpretation. Because the Court finds that the
language used in the Licenses with respect to the repeat
use and limited geographic scope of the Work is ambiguous,
summary judgment is improper at this time.

Defendants argue that even if CTB did exceed the
scope of the 2003 License, the so-called infringements
Harris complains of must be dismissed because they do not
constitute copyright claims and can only be brought as
breach of contract claims. However, insofar as Harris
alleges that CTB exceeded the scope of its Licenses by
publishing the Work in states other than those identified,
he states a valid claim for copyright infringement. See
Tasini, 206 F.3d at 170 ("[T]he fact that a party has
licensed certain rights to its copyright to another party
does not prohibit the licensor from bringing an
infringement action where it believes the license is

23

exceeded or the agreement breached."); Amy Axelrod, Inc. v. Simon & Schuster, Inc., No. 07 Civ. 891 (DLC), 2007 WL 2412257, at *4 (S.D.N.Y. Aug. 27, 2007) (rejecting argument that copyright owner who granted license waived right to sue under copyright statute); Kanakos v. MX Trading Corp., No. 81 Civ. 4632 (WCC), 1981 WL 1377, at *2 (S.D.N.Y. Sept. 16, 1981) ("Where a licensee utilizes a copyrighted work in a manner or to an extent not authorized by the license agreement, the licensee's position is no different from that of an infringer having no contractual relationship with the holder of the copyright [and] the resulting cause of action is one for copyright infringement . . . .").

Defendants also challenge Harris's standing to sue CTB for copyright infringement since S&S has the exclusive right to license excerpts from the Work. Under the Copyright Act, only "the legal or beneficial owner of an exclusive right under a copyright" has standing to sue for infringement. 17 U.S.C. § 501(b). Because "[a]n exclusive license granted by the copyright owner constitutes a transfer of ownership of the copyright rights conveyed in the license," U.S. Naval Inst. v. Charter Comm'ns, Inc., 936 F.2d 692, 695 (2d Cir. 1991) (citing 17 U.S.C. § 101), Defendants contend that only S&S has

24

standing to sue CTB for any alleged infringement. See
Nimmer § 12.02 ("Once the copyright owner grants an
exclusive license of particular rights, only the exclusive
licensee, and not his grantor, may sue for later occurring
infringements of such rights.").

Harris is not, however, just any grantor of the
exclusive right to license the Work; as author and sole
copyright holder, he granted S&S limited rights in the Work
in exchange for the payment of royalties. As such, Harris
qualifies as a "beneficial owner," and retains standing to
sue. See Cortner v. Israel, 732 F.2d 267, 271 (2d Cir.
1984) ("When a composer assigns copyright title to a
publisher in exchange for the payment of royalties, an
equitable trust relationship is established between the two
parties which gives the composer standing to sue for
infringement of that copyright."); Kamakazi Music Corp. v.
Robbins Music Corp., 534 F. Supp. 69, 74 (S.D.N.Y. 1984)
(recognizing songwriter as proper plaintiff under § 501(b)
"since he transferred legal title to the copyrights in
exchange for a percent of the royalties based on sales of
license fees"); Silberman v. Innovation Luggage, Inc., No.
01 Civ. 7109 (GEL), 2003 WL 1787123, at *7 n.5 (S.D.N.Y.
Apr. 3, 2003) (noting that even if plaintiff was no longer

25

the legal owner of the right at issue, "he could still have standing to sue as beneficial owner of that right, based on royalties received or other indicia of control").

Of Harris's remaining complaints related to the Licenses, only one survives. First, while the Licenses contain restrictions of the modifications CTB can make to the Work, none of the Licenses purport to limit CTB's ability to change the font of the text. See Weidman Aff., Ex. F ("The undersigned agrees . . . 4) To make no deletions from, additions to, or changes in the text, without the written approval of Simon & Schuster."). Unlike the text and illustrations in the Work, fonts are not protected by the federal copyright statute, and therefore Harris's allegation that CTB altered the font of the Passage in violation of his copyright is without merit. See 37 C.F.R. § 202.1.

Similarly, Harris's claim that CTB exceeded the scope of the Licenses by "sublicensing" the right to reprint the Work to AIR in violation of the Licenses which provide that the agreement is "non-exclusive and not transferable," is barred by the Copyright Act itself. Section § 201(c) states that "[i]n the absence of an

26

express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that collective work, any revision of that collective work, and any later collective work in the same series." Although the Licenses state that the permission to use plaintiff's Work is not transferable, the 201(c) privilege "is a component of the copyright in the collective work, not the copyright in the individual contributions," Faulkner v. Nat'l Geographic Society, 294 F. Supp. 2d 523, 546 (S.D.N.Y. 2003), aff'd in relevant part, 409 F.3d 26 (2d Cir. 2005), and therefore any arguable "sublicense" in the Work as it was used in the tests is statutorily privileged and does not constitute copyright infringement.

As to Harris's final complaint that the 2003 License authorized the use of only 4, rather than 5, text pages, Defendants claim it was S&S's understanding that each use and repeat use by CTB would be of the same Passage, notwithstanding any purported limitations in the 2003 License. The text of the 2003 License is, however, clear as to the selection of the Work covered by the

agreement, and Defendants' argument to the contrary is not persuasive.

Based on the foregoing, Defendants' motion for summary judgment is denied.

## C. The Request for Attorneys' Fees is Denied

Defendants also seek an award of attorneys' fees pursuant to Section 505 of the Copyright Act. In light of the Court's denial of Defendants' motion, the application for attorneys' fees is also denied.

## Conclusion

Based on the facts and conclusions set forth above, Defendants' motion is denied.

It is so ordered.

**New York, NY**
**August _____, 2009**

ROBERT W. SWEET
U.S.D.J.

28